FILED by _____ D.C.

ELECTRONIC

**Jan 14 2004**

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## Case number:        03 – 61055 – CIV – HUCK / TURNOFF

GRACE TAYLOR,

     Plaintiff,

vs.

ROSS STORES, INC. AND OR ROSS DRESS FOR LESS, INC., A FOREIGN CORPORATION DOING BUSINESS AS ROSS DRESS FOR LESS #152,

     Defendant.

### DEFENDANT ROSS DRESS' NOTICE OF FILING DEPOSITION TRANSCRIPTS

The Defendants, Ross Stores, Inc. and or Ross Dress for less, Inc., a foreign Corporation doing business as Ross Dress for Less #152, certifies that the contents of the deposition listed below must be considered by this honorable Court on matters pending or matters that will be brought before the Court in this cause, and files the following deposition transcript herewith:

1. Page 40 of George Zimmerman, Sr.'s deposition, dated December 11, 2003, taken in the instant case.  This page appears to have not been scanned in Plaintiff's previous notice of filing.

2. George Zimmerman, Sr.'s deposition, dated December 11, 2003, in the case *Miriam L. Galindo vs. Renew Martinez and W. Lazara*, case number 01 – 16246 CA, filed in the Florida state Court – Fifteenth Judicial Circuit Court in and for Palm Beach County, Florida.  By agreement of counsel, the portions of this deposition discussing Mr. Zimmerman's background and qualifications were adopted into Mr. Zimmerman's deposition taken in the instant case on the same day.   Counsel's aggrement was made at pages 3 and 4 of George Zimmerman's deposition, dated December 11, 2003, taken in the instant case.[1]

The Defendant hereby notifies all interested parties of its intent to rely upon the above cited deposition in its Motion *in limine* to Bar Opinion Testimony of the Plaintiff's Expert, George Zimmerman, Sr., its Motion for Final Summary Judgment, and its Reply to Plaintiff's Memorandum

---

[1] Docket number 25.

*Taylor v. Ross Stores*
*Case number 03 – 61055 Civ*
*Judge Huck, Magistrate Turnoff*
*Defendant's Notice of Filing*

in Opposition to its Motion for Final Summary Judgment, and at all other subsequent proceedings

in this action, if necessary.

Respectfully submitted,

JONATHAN FRANKLIN, PA
**Attorneys for the Defendant**

Digitally signed by Jonathan Franklin
DN: CN = Jonathan Franklin, C = US, O =
Jonathan Franklin, PA, OU = Miami,
Florida
Reason: I am the author of this document
Location: Miami, Florida
Date: 2004.01.14 11:55:33 -05'00'

By:

**Jonathan D. Franklin**
9100 S Dadeland Blvd Ste 1702
Miami FL 33156-7817
Tel:     (305) 670 – 5142
Fax:     (305) 670 – 5143
E-mail: CourtInfo@jfpa.com
Florida Bar number: 0048577

**SERVICE CERTIFICATE**

I hereby certify that a true, accurate, and correct copy of the:

**1.   Defendant's Notice of Filing Deposition Transcripts**

in the above captioned matter was served by regular first class mail, postage prepaid, facsimile

transmission, and e-mail upon:

KRUPNICK, CAMPBELL, ET AL.                Facsimile transmission: (954) 763 – 8292
**Attorneys for the Plaintiffs**
700 SE 3Rd Ave Ste 100                    **e-mail:  gdiebold@krupnicklaw.com**
Fort Lauderdale FL 33316-1154

today, **Wednesday, January 14, 2004.**

JONATHAN FRANKLIN, PA
Attorneys for the Defendant

Digitally signed by Jonathan Franklin
DN: CN = Jonathan Franklin, C = US, O =
Jonathan Franklin, PA, OU = Miami, Florida
Reason: I attest to the accuracy and
integrity of this document
Location: Miami, Florida
Date: 2004.01.14 11:55:48 -05'00'

By:

**Jonathan D. Franklin**
Florida Bar number: 0048577

M:\Files\Ross Stores, Inc\2003-1002\NTCE\Filing expert depo transcripts-3000.doc

1          I mean, it was very clear that -- that
2    this employee knew that the floor was very
3    slippery, and it was very easy for him to push
4    cartons that were filled with materials, right
5    along the floor without the help of any wheeled
6    dolly.  That to me told me clearly that the
7    employees knew that this floor was very slippery.
8    Or else they wouldn't have even tried to -- to do
9    that.
10    Q.   Move to strike the reference to actions of
11   counsel.
12         What information do you have about what
13   was in these cartons?
14   A.   Got no information.  It could all very
15   very light weight packing materials.
16         As I said, my report contains a photograph
17   of the young man as he passed me, that -- that
18   shows that the cartons are stacked higher than his
19   head as he's bent over pushing it.  And, you know,
20   and he -- he didn't go 10 feet, he went across the
21   whole back half of the store.
22   Q.   Were you aware that Mrs. Taylor testified
23   that she had found the floor to be slippery prior
24   to her fall?
25         MR. ERBEN:  Object to the form.

Page 1

```
 1           IN THE FIFTEENTH JUDICIAL CIRCUIT COURT
             IN AND FOR PALM BEACH COUNTY, FLORIDA
 2                   CASE NO. 01-16246 CA 22

 3

 4

 5

    MIRIAM L. GALINDO,
 6
                     Plaintiff,              ORIGINAL
 7
    vs.
 8
    RENE MARTINEZ and W. LAZARA,
 9
                     Defendants.
10

11  _____
12                        _ _ _
13           DEPOSITION OF GEORGE W. ZIMMERMAN
                TAKEN ON BEHALF OF THE DEFENDANTS
14                        _ _ _
15

16

17

    DATE:    December 11, 2003
18  PLACE:   515 North Flagler Drive
             Suite 200
19           West Palm Beach, Florida 33401
20

21

22

23

24

25
```

Klein, Bury, Reif, Applebaum & Associates

561-835-0220
b2028016-40c8-4239-92c3-4f50a394f096

Page 2

```
 1                     I N D E X
 2
 3
    GEORGE ZIMMERMAN                          Page
 4
    Direct Examination by Mr. Kelley            4
 5
 6
 7
 8
 9
10                   E X H I B I T S
11  Defendants' for identification           Page
12  No. 1      Affidavit and attachments       24
13  No. 2      Fee schedule                    29
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

1          The deposition of GEORGE ZIMMERMAN, a

2   witness in the above-entitled and numbered cause, was

3   taken before me, Teresa H. Bell, Court Reporter,

4   Notary Public for the State of Florida at Large, at

5   515 North Flagler Drive, Suite 200, in the City of

6   West Palm Beach, County of Palm Beach, in the State

7   of Florida, beginning at the hour of 11:20 o'clock

8   a.m. on Thursday, the 11th day of December, 2003,

9   pursuant to the Notice in said cause for the taking

10  of said deposition, which is annexed to the Court

11  file herein, on behalf of the Defendants in the

12  above-entitled action pending in the above-named

13  Court.

14          The appearances at said time and place were

15  as follows:

16

            LAW OFFICE

17          2800 W. Oakland Park Boulevard

            Suite 301

18          Oakland Park, Florida 33311

            Attorneys for Plaintiff

19          BY:  KIRK J. GIRRBACH, ESQUIRE

20          JAMES C. KELLEY, P.A.

            9100 South Dadeland Boulevard

21          PH 1, Suite 1702

            Miami, Florida 33156

22          Attorneys for Defendants

            BY:  JAMES C. KELLEY, ESQUIRE

23

24

25

Page 4

1    THEREUPON:

2                      GEORGE ZIMMERMAN,

3            Being by the undersigned Notary Public was

4    first duly sworn, in answer to questions propounded,

5    was examined and testified as follows:

6                      DIRECT EXAMINATION

7    BY MR. KELLEY:

8        Q    I have a check for you for $300.00, and if

9    you will fax me a copy of -- fax me an invoice after

10   the deposition, I'll shoot it directly up Tower Hill

11   and tell them to send it directly to your address.

12       A    All right.

13       Q    Would you give me your name and

14   professional address, please?

15       A    George W. Zimmerman, Sr., 353 Window Rock

16   Drive Wellington, Florida 33414.

17       Q    And is that where you would like your check

18   sent?

19       A    That's fine.

20       Q    Okay.  Is that your professional, or home

21   address, or both?

22       A    Both.

23       Q    Okay.  Do you have a business name or

24   entity?

25       A    I do.  Business is George W. Zimmerman

Page 5

1    Architect.  It's a sole proprietorship, and there's

2    also a d/b/a of Zimmerman and Associates for when I

3    associate with other professionals.

4        Q    And give me the second name again.

5        A    Zimmerman and Associates.

6        Q    That's a P.A.?

7        A    No, it's not a P.A.  It's a d/b/a, doing

8    business as.  It's the same, a sole proprietorship.

9        Q    Do you utilize that when you are working

10   with others?

11       A    Yes.

12       Q    Can you give me an example of when that

13   would occur?

14       A    When I would retain a surveyor, and we

15   would work together, have joint responsibility on

16   something.

17       Q    All right.  When did you first register

18   that fictitious name or d/b/a?

19       A    I believe it was January of '93.  It could

20   have been January of '92, some around there.

21       Q    Okay.  Are you a member of any professional

22   organizations?

23       A    Yes.  The Southern Building Code Congress

24   International.  That has just this year evolved into

25   the International Code of Congress.  So, I don't know

Page 6

1    what name officially they're using right now, but I'm

2    a member of that organization.  They promulgate the

3    building codes.  I'm a member of the NFPA, National

4    Fire Profession Association.  I'm a member of AITC,

5    The American Institute of Timber Construction.  I'm a

6    member of ITE, Institute of Traffic Engineers.  And

7    I'm a member of the ICSC, the International Council

8    of Shopping Centers.

9         Q    Have you held any kind of position with any

10   of those organizations?

11        A    No, simply a member.

12        Q    Tell me about your educational background.

13        A    I was educated in a six year professional

14   degree in architecture from the University of the

15   Cincinnati, graduated in 1971.

16        Q    And are you licensed as an architect here?

17        A    Yes.  I'm licensed as an architect in the

18   State of Florida and as a building inspector in the

19   State of Florida.

20        Q    And when were you first licensed as an

21   architect?

22        A    In 1975.

23        Q    And as a building inspector?

24        A    1997.

25        Q    What is involved with being licensed or

1    certified as a building inspector?

2         A    Well, first you need to provide affidavits

3    of qualification to sit for the examination.  Then

4    there is an examination and that is given by the

5    Southern Building Code Congress International or the

6    ICC, and then there's also a state examination.  And

7    once you go through that all of that you get your

8    certification.

9         Q    All right.  The ICC examination, is that

10   accomplished within a single day?

11        A    Yes.

12        Q    How about the state examination?

13        A    The same.

14        Q    Okay.

15        A    And they're done repetitive, one right

16   after the other.

17        Q    Okay.  So, both of them occur on the same

18   day?

19        A    Well, it depends on your status.  Yes, you

20   can.  I was able to take them on one day.  I guess,

21   that's not true of everybody.

22        Q    Why would that be so?

23        A    Because of where they are in their, their

24   qualifications.  They let you take one -- I believe,

25   some people are allowed to take one before they get

1     their experiential portions together.  And so, if you

2     have your complete experience and your affidavits are

3     adequate, they allow you to take them.  And sometimes

4     it's also due to scheduling because SBCCI or ICC

5     gives the test on behalf of the state, the state

6     test, but they administer it.  So, it depends on how

7     they schedule.  Sometimes they're not scheduled --

8          Q     What are the --

9          A     -- sequentially.

10         Q     What are the experience requirements?

11         A     I forget exactly what they are, but I think

12    it's three years on the construction side of the

13    business.  In other words, when I first applied, I

14    thought being a registered architect would

15    automatically qualify me and it did not.  So, I had

16    to go out and get affidavits of experience in the

17    field side of architecture to work in the field.

18         Q     What does that consist of in terms of

19    architecture?

20         A     Well, architecture can be practiced where

21    you do totally the design end of the business in the

22    field and no field administration while a building is

23    being constructed.  So, there is a potential to

24    practice without having that field side experience.

25         Q     And the field side experience is what,

Page 9

1    monitoring the construction process to make sure that

2    what is done conforms with what you've set forth?

3        A    Correct.  It's -- in most architectural

4    contracts, it's known as the field representation

5    portion of the contract, which you spend time in the

6    field during construction, evaluate the work that's

7    being undertaken by the contractor.

8        Q    And then being certified or licensed as a

9    building inspector permits you then to perform the

10   inspections required in the permitting process

11   instead of the inspector employed by a city or

12   county?

13       A    Well, it allows you to do both.  What

14   happened, and actually the reason in '97 I applied

15   for it is, that the state first instituted mandatory

16   licensing for all inspectors.  So, whether you work

17   for a community or not, you still are required to

18   have the license.  So, they gave everybody -- after

19   '92, they gave everybody a five year window to get

20   that license.  And by the time '97 came around, there

21   was a tremendous shortage of licensed inspectors.

22   So, I obtained my license at that time.

23       Q    Okay.  And have you ever worked directly

24   for a city or county inspecting board?

25       A    I was a contract employee for Dade County

1    Building and Zoning for a period that followed

2    Hurricane Andrew for evaluating the rehab necessary

3    on many buildings that were partially destroyed, and

4    they needed people that were qualified to make

5    determinations of what needed to be done to go back

6    in and upgrade them.

7        Q    So, some of that would have been done

8    actually before you got your license?

9        A    Yes.

10       Q    Okay.

11       A    But again, it made me aware of what was

12   happening with -- as I said licensing was just

13   instituted.  So, I got the license when that

14   occurred.

15       Q    Okay.  During of the course of your

16   studies -- you say a six year program.  What degrees

17   did you get?

18       A    That professional program has a Bachelor of

19   Science Degree from the University of Cincinnati.

20       Q    Why is it a six program rather than a

21   regular four year?

22       A    Well, it's a -- because of the way the

23   curriculum is set up.  It actually is equivalent to

24   what a professional Master's Degree program is at the

25   University of Florida today.  It was just -- in the

Page 11

1    previous years, it was done differently, and it

2    provided that different degree.  But it's the

3    professional degree that's required for the

4    examination.  Today you're required to have a

5    Master's Degree to sit for the examination in a

6    similar fashion.

7         Q    The architecture examination?

8         A    Yes.

9         Q    All right.  Did you have to elect any kind

10   of major, a specific area of concentration within the

11   degree program?

12        A    No.

13        Q    Okay.  Were you required to give a thesis

14   or dissertation?

15        A    There's a thesis.  The architectural thesis

16   is a design project.  It's a design of a major

17   facility of some type or another.

18        Q    And what was yours?

19        A    It was an alternative housing project.

20        Q    And can you tell me what was unique or

21   alternative about it?

22        A    Well, both the way in which it was built

23   and it attempted to address the changing family

24   lifestyles and create a multiplicity of building

25   blocks that allowed construction within a major

Page 12

1    complex to grow and diminish as families grow and

2    diminish, so that you provide a lifelong living

3    experience.

4         Q    Now, together with -- what did the project

5    consist of, an actual model, and also a written

6    thesis?

7         A    There were a number of models, renderings.

8    During the process, there was a program that was the

9    written portion of it that provided early on.  It was

10   analysis of the mechanical systems.  The structural

11   systems, in my case, utilized a prefabricated

12   component.  So, it was the manner in which

13   prefabricated components were developed and

14   installed, and that was what the project involved.

15        Q    Have you retained any of the materials

16   related to your thesis?

17        A    No.  Unfortunately, they're big and bulky

18   models and big drawing boards and other things that

19   don't survive well over thirty-five years.

20        Q    Did you get any honors, prizes,

21   distinctions in getting your degree?

22        A    Yes.  I was awarded the AIA medal, and that

23   was for my number one class ranking.

24        Q    And for what year was that?

25        A    1971.

Page 13

```
 1        Q     Okay.  That was your graduating year?

 2        A     Yes, yes.

 3        Q     Okay.

 4        A     Well, it involved the full six year

 5   program.  It was a number one ranking for the six

 6   year performance.

 7        Q     Did you do any kind of student teaching?

 8        A     No, I did no student teaching as a student

 9   in college myself.

10        Q     What kind of continuing education have you

11   had to undertake since getting your degree?

12        A     Well, there's a great deal I undertook

13   before there were mandatory requirements.  There's

14   different programs.  Some put on by the ICSC.  For

15   years I did a great deal of shopping center design

16   and that involved the particular aspects of designing

17   to meet the needs of major and minor trends in

18   shopping facilities.  Also, undertook a program in

19   historic preservation that was sponsored by

20   Progressive Architecture that had to do with the

21   historic rehab that essentially was -- occurred at

22   the time that the first of the tax incentives for

23   historic preservation were enacted by the federal law

24   makers.  I --

25        Q     And -- go ahead.
```

Page 14

1      A      I also participated in Operation
2  Breakthrough, which was a modular prefabricated
3  housing project that was through national
4  competition.  That was with one of the firms that I
5  participated with.  I've participated in a program
6  through the National Criminal Justice Institute in
7  Boulder, Colorado, a week long program on the design
8  and development of the court and jail facilities.
9  Participated more recently in jury design
10  competitions.  Those are kind of really pseudo.
11  There's not too much instruction but evaluation of
12  work performed.

13            And then for the last eight years I've been
14  a certified provider of continuing education for the
15  State of Florida and the Department of Architecture
16  and provide continuing education to architects,
17  building inspectors, and more recently, engineers.
18  And I'm also a certified provider of continuing
19  education for the Florida Building Commission for the
20  Department of Community Affairs concerning the new
21  Florida building code, and I've provided instruction
22  all over the country to professionals registered in
23  the State of Florida that need to get that education
24  as required by the legislature.

25      Q      Okay.  And the new Florida building code,

1    when did that go into effect?

2         A    March of 2002 is when it -- it had a number

3    of false starts, but that was the ultimate effective

4    date.

5         Q    And you said there's now certain

6    requirements, statutory requirements for, I guess,

7    education on the code --

8         A    Well, there were -- when the code was first

9    enacted, every building professional, including

10   contractors, architects, landscape architects,

11   engineers of all disciplines, I guess I said

12   landscape architects, were required to take a four

13   hour orientation class.  And basically, what it was

14   is that, it identified the revisions to the building

15   code from both the previously -- well, there were

16   three previously used codes, The Standard Building

17   Code, The South Florida Building Code and The Epcot

18   Code.

19                So, it was designed, the class was,

20   specifically, designed to inform those people of the

21   changes that had come about by the adoption of the

22   code and also the code took most of the agency

23   regulations that had been a part of the Florida

24   Administrative Code and moved those into the Florida

25   Building Code.  So, it was making people aware of the

Page 16

1    one code source.

2         Q     What was the third code you mentioned, the

3    Standard, The South Florida and the?

4         A     Epcot, E-P-C-O-T.  That's almost an

5    exclusive -- well, it is exclusively a Walt Disney

6    World building code.

7         Q     Okay.  Do you have any degrees in

8    engineering?

9         A     No.  The only engineering expertise is what

10   I have qualified by my architectural licensure and

11   that is actually a seven test portion.  In order to

12   get an architectural certification, structural

13   engineering is one of those seven tests that I've

14   passed and been certified as a part of my

15   architectural licensing.  And that also relates to my

16   Bachelor of Science Degree in architecture which was

17   more heavily oriented to the engineering and

18   scientific side of the architectural profession more

19   so than other schools of architecture.

20        Q     Are you a licensed general contractor?

21        A     No.

22        Q     Talk to me a little bit about the

23   requirements currently for continuing ed in terms of

24   both your architecture license and your building

25   inspector.

1      A     The building inspector has a requirement of

2   twelve hours per year.  The architectural license has

3   a requirement of twenty hours per year or twenty

4   hours biannual, every two years.  Many of the

5   continuing education credits that I earn currently

6   are based upon my recertification of new teaching

7   programs and the teaching of those programs.  In

8   other words, what qualifies as completion is your

9   creation of a new program, having certified through

10   the state, and then instructing that program to a

11   series of professionals.

12      Q     Do you have to get relicensed or

13   recertified as either an architect or a building

14   inspector?

15      A     You're not recertified unless for some

16   reason you let it lapse.  Every two years you need to

17   renew your licensing, which is just a certification

18   on your part that you've completed the continuing

19   education and you pay your fee.

20      Q     And how about as a building inspector?

21      A     Same thing.

22      Q     Same thing.  Two years?

23      A     Yearly.

24      Q     Okay.  Once you completed your degree

25   program, if you would, go kind of broadly over your

1    employment history.

2         A    Okay.  The first fifteen years of my career

3    I served as an architect for Richard L Bowen and

4    Associates in Cleveland, Ohio.  There were a few

5    months for someone else, but essentially the time

6    period was spent with Richard L. Bowen.

7         Q    B-O-W-E-N?

8         A    That's correct.  And after I was with them

9    for, approximately, four years, I became their

10   vice-president, worked my way up to their

11   vice-president.  It was a hundred man architectural

12   and engineering firm head quartered in Cleveland with

13   offices in Fort Lauderdale and for awhile in Orlando.

14        Q    Okay.  Where were you located?

15        A    I was located in Cleveland, Ohio, and

16   essentially I headed up the operations in Orlando for

17   awhile, and I also headed up operations in Fort

18   Lauderdale for awhile.

19        Q    When did you go down to Orlando?

20        A    1979.

21        Q    And then Fort Lauderdale?

22        A    Fort Lauderdale was more on and off.  We

23   had some other people in the office, and then

24   intermittently I would spend periods down there, but

25   that was more irregular.

Q And as vice-president, were you assigned any particular area of concentration?

A The separation, essentially, was by clientele within our firm. I had a number of clients for which I was responsible and, essentially, I determined the work, the staffing, the management of all of the work for that -- for those clients. And also the main focus of my efforts was the management and approvals of the front-end design and construction documents.

So that I spent most of my time with clients to make sure their input got correctly incorporated into the documents and also with the code jurisdictions all over the eastern half of the United States to evaluate the work, architectural and engineering work, that our firm did and to make sure it met the approvals of the local codes and the projects were properly permitted, constructed, and received their occupancy permits.

So, those were the, let's say, the area of my focus. But below me I had secondary level managers, and I essentially managed the completion of all of the entire projects for my clients.

Q Any particular type of projects, shopping centers, residential dwellings?

1       A       Over the years there was the full gamut.

2    The majority of the projects that we did were major

3    shopping malls and shopping center facilities all

4    over the country.  In Cleveland I was the primary

5    manager and designer of the Cleveland Hopkins Airport

6    Expansion, which took place over thirteen years, and

7    numerous contracts of up to about eighty million

8    dollars, and that's back when eighty millions dollars

9    got you something, got you a whole airport, back in

10   '73 through '76.

11      Q       After working for the Bowen firm, where did

12   you go?

13      A       I became vice-president of development of

14   Deutch Ireland Properties in Fort Lauderdale,

15   Florida, responsible for all of their development

16   projects.  Some of the notable ones are the Fashion

17   Mall at Plantation, Quantum Park in Boynton Beach,

18   the Broward County Convention Center Project, the

19   West Palm Beach Convention Center Project.

20      Q       Give me the name again.

21      A       Deutch Ireland.

22      Q       How long were you with them?

23      A       For six years.

24      Q       And then after that, what did you do?

25      A       Then I opened my own small practice in

Page 21

1    development and design practice, which I currently

2    still maintain.

3        Q    And that is the work you do either as a

4    sole proprietor or through your fictitious name

5    entity?

6        A    Well, it's all as sole a proprietor, yes.

7    All the work is done as a sole proprietor.

8        Q    And what kind of projects are you involved

9    with there?

10       A    I do consulting on matters in litigation.

11   I provide continuing education classes to architects,

12   engineers, contractors, building officials.   I

13   provide development, consulting and master planning.

14   I prepare conceptual development site plans and land

15   development plans for retail shopping center

16   developers.  And I provide planning services for the

17   development of large land tracts.

18       Q    Run that past me again, the last --

19       A    Services to owners on large land tracts.

20       Q    Are you able to breakdown for me how much

21   time you spend in the litigation consultation area as

22   opposed to other areas?

23       A    The percentages swing quite a bit from time

24   to time, but I'd say up until a few years ago,

25   essentially it was a 50/50 split.  It's probably more

1   like a 70/30 split over the last two years, more

2   litigation consulting.

3          Q    Do you have a CV?

4          A    Yes.

5          Q    Can I take a look at that?

6          A    I didn't bring one separately.  It was with

7   my copy here of the -- I thought you had a copy of my

8   affidavit which incorporates the CV.

9          Q    I do.

10              MR. GIRRBACH:   It's attached as the first

11         exhibit.

12  BY MR. KELLEY:

13         Q    This one that I have here is dated June 1,

14  2002.  Any significant changes since that date?

15         A    I think since that date I have added in the

16  listing of some of the courses that I teach in

17  continuing education that wasn't in there previously.

18  I guess it does have it in there.  I take it back.  I

19  just saw that when you turned the page.  That may

20  very well be the latest copy.  I thought there was

21  one in 2003.  Very minor revisions if there are any.

22  Yes, it's got the DPR classes listed.  I think that's

23  the latest version.

24         Q    I see here under educational services you

25  were involved with efforts to license a

1    paraprofessional College of Architecture and Growth

2    Management?

3         A    Yes.

4         Q    Does that institution still exist?

5         A    No, it doesn't.  We could never get it

6    properly funded.  We got it licensed, but no takers

7    and, particularly, when FAU announced that they were

8    going to have an architectural school here in South

9    Florida, it diminished any interest, and then they

10   never followed through and did anything.  So, even

11   though this was licensed, it really never got off of

12   the ground.

13        Q    Other than your instruction through your

14   certification for continuing education programs, have

15   you done any other kind of teaching?

16        A    No, except a lot of the expert witness work

17   is really teaching about the codes.

18        Q    True, true.  I'm trying to look here.  Do

19   you have your publications listed in here?

20        A    I don't have any publications.

21        Q    Okay.  And I guess let's get this marked

22   for the deposition.  We're going to be referring to

23   this so let's go ahead and mark the affidavit.  And

24   let me just make sure I've got all the portions of

25   it.

Page 24

1          I've got the affidavit itself, which is

2   three pages dated November 1, 2002.  And I've then

3   got the curriculum vitae dated June 1, 2002, which

4   closes with prior architectural experience.  And then

5   I have photographs labeled exhibit two which contains

6   photographs running from letter A through letter H;

7   Exhibit three, which are handwritten notes concerning

8   the site examination with the date on it, October

9   24th, 2002; Exhibit four, which is Chapter 5 of the

10  Life Safety Code.

11        A    It's Chapter 5 excerpts.

12        Q    Excerpts, okay, of the Life Safety Code.

13  It appears to be the 1994 edition which consists of

14  two pages.  Then Exhibit 5, ASTM, Standard Practice

15  For Safe Walking Surfaces, and complete that with

16  three pages.

17        A    Three pages.

18        Q    Do you have anything else attached to your

19  affidavit packet?

20        A    No, this is it.

21        MR. KELLEY:  We'll get that marked then as

22        Defendants' Exhibit 1 for the deposition and

23        have a copy attached.

24             (Defendants' Exhibit No. 1 was marked

25              for identification.)

Page 25

1    BY MR. KELLEY:

2         Q    Do you have a listing of the cases in which

3    you have appeared as an expert witness over the last

4    four or five year period?

5         A    Yes.

6         Q    Do you have that with you --

7         A    No.

8         Q    -- and I can rush through that.

9         A    I don't have it with me.  It wasn't

10   requested, so I didn't bring it.

11        Q    Do you think you could put your hands on

12   that and either provide it through counsel or --

13        A    Sure.

14        Q    Okay.  Can you identify any of those cases

15   as involving factual scenarios similar to what we

16   have in this case of Galindo versus Martinez?

17        A    Are you asking me to do additional work for

18   which I'm going to be paid, or are you asking me to

19   send you what I --

20        Q    If you can recall any cases that presented

21   similar factual scenarios.

22        A    The same question applies.  Should I spend

23   time and bill you for it to go through and do that,

24   or should I send you what I have?

25        Q    No, send me what you have.

Page 26

1          Can you tell me how many cases,

2    approximately, you've been involved with?  What term

3    does your list encompass?

4          A    Well, it's basically the last three years

5    plus some follow on of earlier times and that, I

6    don't know when.  The cases aren't numbered, and I

7    don't know the number except that I seem to be

8    involved in about thirty items or so a year,

9    something like that.  I mean, that's my gut feeling

10   for where it's at.  It might be a little more or a

11   little less.  I don't know.

12         Q    Of those thirty items or assignments per

13   year, how many of them lead you to giving a

14   deposition?

15         A    No, no.  Thirty that are deposition or

16   trial.  Thirty occurrences of testimony per year.

17         Q    Oh, okay.  And do you have some additional

18   that for one reason or another don't reach the

19   deposition or trial testimony stage?

20         A    Oh, yeah.  There's additional cases.  I

21   mean, there's none listed that -- I thought you were

22   referring specifically to the list.

23         Q    Right.  Can you give me an idea of how many

24   assignments you would have over the course of the

25   year that don't make the list because they don't

```
 1    involve testimony?

 2         A    No, I can't.

 3         Q    How did you come to be retained in this

 4    case?

 5         A    Mr. Girrbach called me.

 6         Q    Do you recall, or have you noted about when

 7    that was?

 8         A    Yes.  The initial telephone call, we

 9    reviewed the case was on September 11th of 2002.

10         Q    Had you dealt with Mr. Girrbach on prior

11    cases?

12         A    No.

13         Q    Do you know how Mr. Girrbach got your name?

14         A    No, I don't.

15         Q    And as we sit here, do you recall what

16    Mr. Girrbach told you on that occasion that this case

17    involved?

18         A    Other than a general description, that's

19    all I can remember.  That there was a -- I don't

20    think I took any notes at all.  That there was a trip

21    at a misaligned concrete surface.

22         Q    And you checked and you did not have any

23    notes concerning that initial conversation?

24         A    That's correct.

25         Q    Okay.  At that time, did you discuss what
```

1    your compensation would be?

2         A    Yes.

3         Q    And what arrangements were made for your

4    compensation?

5         A    I sent him a copy of my then current fee

6    schedule, and informed him that I worked on an hourly

7    basis in accordance with the fee schedule, and I

8    added the fee schedule would change from time to

9    time.

10             So that it's been, basically, on an every

11   two and a half to three year basis that fees will be

12   assessed and modified, and then at that point in

13   time, such fees will increase.

14             I brought for you today a current copy of

15   that fee schedule.

16        Q    All right.  This is a current fee schedule

17   dated July 1, 2003.  So, it's been since that point

18   in time that these hourly rates have been applicable?

19        A    That's correct.

20        Q    All right.  The document speaks for itself.

21   Basically, $300.00 dollars per hour for consultation

22   or deposition or court testimony, correct?

23        A    Correct.

24        Q    And then the $200.00 per hour for all other

25   services.  What would you be referring to there,

1    research?

2        A    Well, yes, any kind of research or work

3    done while under retainer, if you continue reading.

4    But, it would be essentially all other work other

5    than testimony is provided at $200.00 per hour when

6    I'm under retainer.   When I'm not, it's at $300.00

7    per hour.

8        Q    Okay.   Then an additional one time

9    accounting charge of $45.00 for parties that have not

10   submitted a retainer or paid in advance.

11              Let's get that marked as Exhibit 2.

12                  (Defendants' Exhibit No. 2 was marked

13                  for identification.)

14   BY MR. KELLEY:

15       Q    After you've had your initial telephone

16   conference with Mr. Girrbach, did he provide you with

17   any materials for your review?

18       A    No.   I believe what we did was just

19   arranged for a site examination, and at that point in

20   time, I met with Mr. Girrbach and the Plaintiff, and

21   also a witness by the name of Yamile Garcia.

22       Q    Did this conference with Ms. Galindo and

23   the witness take place at the same time as the site

24   inspection?

25       A    Yes.

Page 30

1      Q     And when did that occur?

2      A     That occurred on October 24th of 2002.

3      Q     And over the whole period of time that

4  you've been involved with the case, have you been

5  provided with any materials --

6      A     No.

7      Q     -- by Mr. Girrbach?

8      A     Other than the notice of deposition that

9  was faxed yesterday and also Tom Black's answers to

10 expert interrogatories.

11     Q     You told me October 24, 2002.

12           What did you do at the -- let me back up.

13           What did the witnesses tell you about the

14 incident that occurred?

15     A     They essentially explained -- I mean,

16 essentially, Ms. Galindo explained where she was, the

17 direction she was moving, the fact that she was with

18 a small child, a young boy I believe, following him

19 along at the front of the residence, and that he fell

20 and she fell over the misaligned slabs, pointed to

21 the position where it occurred.  And Yamile Garcia,

22 the witness, essentially just agreed with what she

23 was saying.  She didn't add or provide anything other

24 than the fact that she supported everything that

25 Miriam Galindo had told me.

1    Q    I think the misaligned slab that you're

2    referring to is identified in one or more of the

3    photographs attached to your affidavit.  If you would

4    identify which photographs depict that slab or those

5    slabs.

6        A    The misalignment that is shown from

7    different angles in photographs A, B, C, D, E, F.

8    That's it.  And also the dimensional configuration at

9    the risers of the step which is adjacent to the crack

10   as shown in my site examination notes.

11       Q    You say the dimension of the risers of what

12   now?

13       A    On the adjacent step.  The things that I

14   measured were the height of the crack or the

15   misalignment, which varied between three-quarters

16   inch to two inches, and then immediately adjacent to

17   that crack is the riser for the platform at the --

18   the egress platform from the house, and measured that

19   at eleven inches and nine inches, respectively.

20       Q    Did you do anything else at the site

21   inspection?  You spoke with the witnesses, you took

22   photographs, you took measurements of the dimension

23   that you just described.  Did you do anything else in

24   the course of your site inspection?

25       A    Yes.  I took an overview of the

1    construction activity on the site since it was

2    ongoing at the time of the inspection, and noted the

3    construction of the raised concrete platform

4    immediately adjacent to the accident area in the

5    drive, primarily, because the work appeared not to

6    have been done in a professional manner.  And the

7    work, by it's nature, was inconsistent with a number

8    of basic parameters for slab construction detailing.

9         Q    Do you know when the misaligned concrete

10   slabs were formed or constructed?

11        A    No, I don't, but it was obvious from the

12   construction, it was obvious to me that the

13   construction had actually been formed in a misaligned

14   pattern.  In other words, it was not a case that the

15   slabs either settled or raised.  It was a matter that

16   they were misaligned.  As of at the time they were

17   constructed, they were out of alignment.

18        Q    Anything else that you did during the

19   course of your site inspection?

20        A    No.

21        Q    All right.  You then prepared -- did you

22   prepare the affidavit --

23        A    Yes.

24        Q    -- that we have marked as Exhibit 1?

25             Okay.  When did you do that?

1      A    That was prepared on November 10th of 2002.

2      Q    Was that at the request of the

3  Mr. Girrbach?

4      A    Yes.  He had asked that I prepare an

5  affidavit of my findings.

6      Q    And in addition to your affidavit, have you

7  prepared a report concerning your findings?

8      A    No.  The affidavit is all inclusive.

9      Q    Okay.  Let me go over this briefly.

10  Paragraph one of the affidavit sets forth your

11  qualifications, correct?

12      A    Correct.  And actually one and two, and

13  then paragraph two refers to exhibit one, which is my

14  CV.

15      Q    Okay, great.  Number three indicates that

16  you had reviewed the South Florida Building Code NFPA

17  101, Life Safety Code and accessibility provision of

18  Florida Statutes 553, part Roman numeral five?

19      A    Right.

20      Q    As well as the ASTM Standard Practice For

21  Safe Walking Surfaces, Number F1637-95, correct?

22      A    That's correct.

23      Q    When had you consulted those resources?

24      A    At the time that I was spending and putting

25  together the affidavit.  Most of the generalities of

1   these resources are known to me by experience, but

2   the actual confirmation of those and the selecting of

3   the excerpts was done at the same that I prepared the

4   affidavit.

5        Q    Do you later tell us what portion of the

6   South Florida Building Code you felt was applicable?

7        A    The South Florida Building Code, I haven't

8   focused on that or provided excerpts, but essentially

9   the unpermitted activity taking place on the site I

10  felt to be in violation of the portions of Chapter 3

11  of the South Florida Building Code that are relevant

12  thereto.

13       Q    But this was something that was going on

14  sometime after the fall had occurred, correct?

15       A    Yes, but the evidence of -- as I said,

16  there were a great number of different building

17  projects that had gone on over periods of time that

18  were visible on the site.  So that, although, I do

19  not have evidentiary proof of the fact, it appears to

20  me, as a professional involved in this kind of work,

21  that there were a substantial number of unpermitted

22  construction projects that had taken place on the

23  site.

24       Q    Okay.  So, you made that assumption based

25  on what you observed that day?

Page 35

1        A       No, no, I didn't make that assumption.    I

2    made that observation, and I have that opinion.

3        Q       Okay.  You then refer to the NFPA 101 Life

4    Safety Code.  What is the NFPA?

5        A       The NFPA is the National Fire Protection

6    Association, and they developed a code that addresses

7    egress ways and various kinds of fire suppression,

8    safety equipment, and various types of construction

9    to eliminate dangers from fires, explosion, et

10   cetera.

11       Q       Now this case, of course, did not involve a

12   fire or explosion, correct?

13       A       Correct.

14       Q       All right.  Do you know of any reference

15   that specifically applies NFPA 101 to single family

16   residences?

17       A       Yes.

18       Q       What is that?

19       A       That's -- the South Florida Building Code

20   incorporates by reference the requirements of the

21   NFPA for egress into the South Florida Building Code.

22   That's in Chapter 4 of the code, and there is no

23   exception provided for residential properties.

24       Q       Now, you also make reference to the

25   accessibility provision of Florida Statutes Chapter

Page 36

1   5553, Part 5.   What does that section of the Florida

2   Statutes deal with?

3        A    It deals with accessibility.   Part 5 of the

4   code provides requirements for handicapped

5   individuals.   Part 6 in Chapter 553 is the state

6   minimum building code, which is minimum standards for

7   all construction for the benefit of all the people of

8   Florida, and Part 5 are incorporated in those

9   standards as part of the statement on the building

10  code.   Therefore, it would apply on that basis.

11            However, the requirements of the

12  accessibility code apply to common areas of

13  multi-family housing facilities.   You've called this

14  a single family residence.   It was my observation

15  that it was not being utilized as a single family

16  residence at the time that I was there, but as a

17  tenement house.   And therefore, it is on the

18  borderline of jurisdiction.   That's why I did not

19  include the accessibility provisions in my affidavit.

20  I felt that it was a borderline call and it appeared

21  to be an illegal occupancy of the single family house

22  as essentially an apartment use or multi-unit use.

23       Q    What was it that led you to conclude it was

24  being used as a multi-family residence?

25       A    The number of separate entrances and the,

Page 37

1    you know, separate parking facilities, and the

2    lockout of the main area for parking that would

3    require parking by the other tenants outside of the

4    fence.   Those kinds of things.

5        Q    Anything else you can point to

6    specifically?

7        A    Not specifically.

8        Q    And then you refer to the ASTM Practice For

9    Safe Walking Surfaces?

10       A    Correct.

11       Q    How does that have jurisdiction over this

12   particular premises?

13       A    It's a community standard promulgated by

14   all of the professionals involved in the design and

15   manufacture of walking surface materials that has

16   been developed as a guideline, again, as a community

17   standard, for what constitutes a safe practice with

18   respect to walking surfaces.   So, it involved both

19   maintenance and construction issues.   And as the

20   standard indicates, it is applicable to both new

21   facilities and existing construction.

22       Q    All right.   Your opinions are then listed

23   as subparagraphs to paragraph four?

24       A    That's correct.

25       Q    Okay.   Look first at subparagraph A:   The

Page 38

1    residential site where the accident occurred was the

2    site of a significant amount of unpermitted

3    construction activity.  In fact, unpermitted work

4    appeared to have been in progress on the date of the

5    site examination.  Unpermitted and uninspected work

6    was deduced from the level of noncompliance with the

7    applicable codes, and because of unworkmanlike

8    character of many improvements.

9            You're saying there what you had said

10   earlier, that you made those observations and

11   concluded that the activity going on when you were

12   there for the site inspection and that you believe

13   had gone on before had been done not by professionals

14   but by lay people, correct?

15       A    Well, yes, but that wasn't -- it's not just

16   a matter of professional versus lay people.  It's not

17   constructed in a workmanlike manner.  It falls below

18   the standard of being competent workmanship and

19   competent design work.  Particularly, as I mentioned

20   earlier, the risers going up to the front entrance.

21           So, for all of the access and egress, the

22   risers were far beyond the limitations that are

23   acceptable for any stairs under the code.  So, it was

24   a major code violation right at the primary entrance

25   to the premises.  That combined with the fact that

Page 39

```
 1    this slab was actually constructed in a misaligned

 2    manner, and that whoever did the work saw no purpose

 3    in making them align indicates again that they

 4    weren't -- they didn't have the professional

 5    understanding to undertake the work that they were

 6    doing.

 7         Q    Subparagraph B:  An improperly constructed

 8    concrete slab joint within the egress path was the

 9    cause of Ms. Galindo's accident.

10              Number one, how is it that this slab joint

11    is within the egress path?

12         A    It's in the area that you would need to

13    walk to get from the house to the opening in the gate

14    to the driveway that would be used to exit the

15    premises.

16         Q    You're saying to get from the front door to

17    the driveway gate, you would have to pass over this

18    joint?

19         A    That's correct.  If you drew a straight

20    line from the doorway to that gate, to the opening,

21    which is the natural path of travel, you would need

22    to travel over this misaligned area.

23         Q    Okay.  Is there no path that would not take

24    you across the joint?

25         A    No direct path.
```

1      Q     Okay.  So there is some path, but not a

2  direct path?

3      A     Yeah.  I mean, you could do a circuities

4  route and avoid it, but that's not normally the way

5  people ambulate.  That's why it's important to serve

6  the direct path.

7      Q     Subparagraph C -- let me finish that.

8            Ms. Garcia confirmed both the location of

9  the accident and the direction Ms. Galindo was

10  traveling.

11            Now, was it your understanding that

12  Ms. Galindo was traveling along that pathway, that

13  is, from the area of the front door toward the gate?

14      A     No.  She was traveling a path from the side

15  yard of the house to the front yard of the house.

16      Q     What was it about the joint that caused

17  Ms. Galindo to trip?

18      A     The height of the misalignment.

19      Q     Had she been traveling from the doorway to

20  the -- or in the direction of the driveway gate,

21  wouldn't the -- wouldn't it be a step down rather

22  than a step up?

23      A     That's correct.

24      Q     So, how is it that the step up then becomes

25  involved in the path of egress?

1     A     That area is the path of egress, and there

2     also needs to be a path of egress from the side door

3     of the house to the back door of the house out to the

4     public way.  So that either of those other two paths

5     that you would come across the same joint

6     potentially, not necessarily but potentially.

7     Q     Okay.  Potentially with the step up

8     condition?

9     A     Correct.  But also the step condition is

10    dangerous to somebody who would step on the change in

11    elevation and potentially twist their ankle or not

12    understand that there's a step down and would over

13    react at the time, that ground level was not at the

14    elevation it should be at, and it forms a tripping

15    hazard in many different ways depending upon how it's

16    traversed.

17    Q     All right.  You also identify photographs A

18    and B of exhibit two as reflecting a close-up view of

19    the faulty joint.

20          Subparagraph C:  The change in elevation at

21    the joint varies from three-quarters of an inch at

22    the south end to two inches where it abuts the front

23    stoop.  It measures approximately one and

24    three-quarter inches at the location where

25    Ms. Galindo fell.

1        Anything significant about the variance in

2   the elevation?

3        A    Just that changes in alignment that are

4   greater than one-quarter inch are seen to be

5   significant tripping hazards.  And under the

6   standards in the codes that I've identified are

7   things that need to be eliminated.

8        Q    Where do you get that figure of anything in

9   excess of one-quarter inch?

10       A    Okay.  It's a figure that's out of the ASTM

11  Standard.  It's attached thereto.  It's the same

12  figure that is incorporated within the accessability

13  as the criteria.  It's the same criteria used for

14  sidewalk joints by the Department of Transportation,

15  and their standards relative to misalignments.  So,

16  it's pretty well accepted as the criteria for

17  misalignment avoidance.

18       Q    Subparagraph D:  The subject elevation

19  discrepancy was constructed that way.  It was not a

20  result of slab or ground settlement.  The

21  construction was improper because of the

22  misalignment.

23            I think you've addressed that before.

24       A    Correct.

25       Q    The elevation discrepancy was intentional?

Page 43

1      A    Yes, it's formed in at a different

2    alignment.

3      Q    All right.  D:  The accident area was part

4    of the exit discharge of means of egress as defined

5    in Section 5-1.2 of the NFPA 101 Life Safety Code.

6           Does that portion of the code define the

7    exit discharge area?

8      A    Yes.

9      Q    How does that portion of the code define

10   the exit discharge area?

11     A    The area that incorporates intervening

12   courts and yards that extends from the exit to the

13   public way.

14     Q    All right.  Subparagraph F:  The walkway

15   area was unsafe and did not comply with reasonable

16   standards of safety for walkway surfaces within the

17   community.  The ASTM Standard Practice For Safe

18   Walking Surfaces, with the references to the

19   reasonable standard, Sections 1.1 and 1.2 identify

20   the appropriate application of ASTM of this accident

21   site.

22          What do 1.1 and 1. 2 reflect?

23     A    Basically, gives the scope of the standard

24   and indicates that it's applicable to both new and

25   existing facilities.

Page 44

1          Q     And you go on to indicate that Sections

2     4.1.1 and 4.2 identify the abrupt change in elevation

3     at this site as being unacceptable.

4                What do those subsections provide?

5          A     Well, Subsection 4.1.1 provides that the

6     walking surface has to be flush, even, and fair.  And

7     then it goes on to say if there is a change in

8     elevation it needs to comply with the standards of

9     4.2.  The standards of 4.2 says that an abrupt change

10    in elevation is permissible up to a height of

11    one-quarter inch, and after that it needs to be

12    beveled up to a level of one-half inch, and after

13    that it needs to be built as a stair, and meet the

14    stair requirements of the code, of the local code

15    having jurisdiction.

16         Q     Which in our situation for this date and

17    events would have been the South Floirda Building

18    Code?

19         A     And the Life Safety Code, both.

20         Q     You then reference Section 4.7.2?

21         A     Yes.  That reference, basically, says that

22    if it doesn't meet that standard, you should fix it.

23         Q     Okay.

24         A     And it's -- let me get the exact wording.

25    It says, exterior walkways shall be repaired or

Klein, Bury, Reif, Applebaum & Associates

Page 45

1    replaced where there is an abrupt variation in

2    elevation between surfaces.  Vertical displacements

3    in exterior walkways shall be transitioned in

4    accordance with section 4.2, which is the earlier

5    that says build a ramp or a stair.

6         Q    Okay.  To cure this defect they would

7    either need to make both slabs level, both surfaces

8    level, or turn it into a step?

9         A    Or take out a portion of one or both and

10   ramp the surface in between the two at a slope less

11   than or equal to one and twelve.

12        Q    Even the higher sections could be ramped,

13   the higher elevation differences?

14        A    That's correct, as long as you make it

15   clear where the ramp is located and that there is a

16   ramp there.  There is a problem at times of putting

17   in small ramps that you don't demarcate them well

18   enough so that they're seen.  But assuming all of

19   that is done, that would be an alternative.

20        Q    Okay.  After your site inspection and the

21   preparation of the affidavit, have you undertaken any

22   additional work on this assignment?

23        A    Only to review these items for deposition

24   today.

25        Q    Okay.  And how long did you spend doing

Page 46

1    that?

2        A    About an hour and fifteen minutes.  Also, I

3    met briefly with Mr. Girrbach this morning.

4        Q    And you reviewed the materials this

5    morning?

6        A    No, I reviewed the materials yesterday, and

7    then just met about fifteen minutes with Mr. Girrbach

8    this morning.

9        Q    Do you anticipate doing any additional work

10   on this assignment?

11       A    I would expect to review the deposition of

12   Mr. Black if it's taken, and really I would do

13   anything else that Mr. Girrbach asked me to do prior

14   to the trial.

15       Q    Do you know when this home was constructed?

16       A    No, quite some time ago but not

17   specifically, no.

18       Q    When was it that the State of Florida

19   adopted the NFPA 101?

20       A    Well, the State of Florida adopted it, I

21   believe, in 1985 or maybe in the session in '84,

22   adopted it statewide.  But Dade County adopted it

23   long before that.  I think in the late '30s and early

24   '40s.

25       Q    Late '30s, early '40s?

```
 1        A    I believe.  I'm not certain, but I believe

 2   that's about the time frame that the -- at that point

 3   it was NFPA 101 called The Fire Code, but it served

 4   as the basis of the Dade County Fire Prevention Code.

 5        Q    What was the building code in effect back

 6   at that time?

 7        A    Well, the building code, the first edition

 8   of the South Florida Building Code, I believe, was

 9   1949.  Prior to that, I don't know what the building

10   code was.  It could have been the Southern Standard,

11   but it appears to have been modeled after that.  I

12   don't know.

13        Q    All right.  About how much time have you

14   put into this assignment up to this point?

15        A    Well, other than the few hours I have

16   recently, it's a total of what is shown on these

17   invoices, which is six and a half hours.  Probably a

18   total of about eight and a half hours.

19        Q    That would include today's time?

20        A    Yes, not the deposition, but the time other

21   than the deposition.

22             MR. KELLEY:  That's all I have.  Thank you.

23             THE WITNESS:  Thank you.

24             MR. GIRRBACH:  Read.

25
```